## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BRADY, | ) | CASE NO. 1:09-cv-0009 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| TERRY COLLINS, Director, Ohio | ) | |
| Department of Rehabilitation and | ) | |
| Correction, *et al*. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Respondent. | | |

Petitioner, James Brady ("Brady"), challenges the constitutionality of his conviction in

the case of *State v. Brady*, Cuyahoga County Court of Common Pleas Case No. CR-04-451267.

Brady, *pro se*, filed his petition for a Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C.

§ 2254 on January 5, 2009.  On April 28, 2009, Terry Collins ("Respondent") filed his

Answer/Return of Writ.  (Doc. No. 6.)  Brady did not file a Traverse.  This matter is before the

undersigned Magistrate Judge pursuant to Local Rule 72.2.  For reasons set forth in detail below,

it is recommended that Brady's petition be DENIED.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts "shall be presumed to be correct."

28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate

court summarized the facts underlying Brady's conviction as follows:

[*P4]  The state presented the testimony of the woman, R.B., who was born in 1961.  In 2002, when she still resided with her mother and her stepfather, defendant, R.B. worked on a maintenance crew at Frommer ATC and her boss was Nate Hart. She generally took a cab to work, and worked from 1:00 p.m. until 7:00 p.m.

[*P5]  The woman testified that her mother left early in the morning to go to work and defendant would generally wake her up.  When she was getting out of the bathtub, and was getting dressed, defendant approached her.  He was wearing just a snap robe and told her that she had time and did not have to get dressed.  The woman told defendant that she did not want to have sex but he took off his towel then kissed her vagina then inserted his penis into her.  She testified that defendant has a big penis.  The woman further testified that some "white stuff came out" and she became scared.  She took a shower to try to get the white stuff off of her then told defendant to go into his bedroom so she could get ready for work.  Defendant told the woman that this would make her feel good to go to work and would calm her down.

[*P6]  The woman also testified to another incident when defendant had her kiss his penis and told her it would make him feel good.  She testified that a liquid came out of his penis.  R.B. stated that the white stuff tasted yucky so she spit it out in the toilet, but some was around his penis and on the sheets.

[*P7]  The woman testified that she tried to talk to Nate Hart about what had happened but felt uncomfortable and asked him if she could speak with a female.  She then spoke to Lisa Gessler and reported that defendant put his penis inside of her.  The woman had difficulty remembering but stated that defendant put his penis in her twice.

[*P8]  On cross-examination, the woman acknowledged that she had sent her father cards.  She also admitted that she saw her doctor in September 2002 but did not tell her of any abuse.  The woman stated that she watches soap operas and that shortly before her disclosure to Gessler she had watched a movie about a woman who accused someone of rape.  She also stated that she had taken a class on sex education in which she had learned the words penis and vagina.  She stated on redirect examination, however, that she knew the difference between the truth and a lie and that she had told the truth.

[*P9]  Nathaniel Hart testified that he works for the Cuyahoga County Department of Mental Retardation and that he supervises a cleaning crew which included R.B.  Hart testified that the woman appeared to enjoy her job and talked to the other workers but by the summer of 2002, she had "an attitude" and began

-2-

protesting her job assignments. The woman became fearful and cried when it was time to go home but she did not allow Hart to call her parents. She yelled and rocked while Hart drove the workers home. She told Hart that she did not want to go home but would not tell him the reason.

[*P10] Hart informed his supervisor, Jim Cable, of the woman's behavior and Cable arranged for her to have a consultation in the psychiatric department. Since making the disclosure, the woman has lost a lot of weight, is tearful, and has panic attacks. She sometimes lies then quickly recants her lies.

[*P11] Jim Cable testified that Hart is one of his best employees. He further testified that R.B. functions at the level of a younger adolescent, *i.e.*, in the range of a thirteen or fourteen year-old.

[*P12] R.B.'s general demeanor was friendly, bubbly and pleasant. Cable later learned that R.B. was upset, so he spoke with her. She became teary-eyed but would not talk. Cable asked if she wanted to speak with a female and she replied that she did. The next day, R.B. spoke to psychologist Lisa Gessler and Gable found an emergency placement for her. Since this time, the woman's demeanor is now bitter and sad and she is difficult to work with.

[*P13] Lisa Gessler testified that the woman was crying heavily when they met so Gessler gave her gum in an effort to stop her from sobbing. The woman told Gessler that her father touches her "down below" and that she tells him "no." R.B. then related an incident which occurred near the shower. She also told Gessler that she was worried about being pregnant because defendant does not use a condom. She further stated that defendant "does it hard" and she keeps getting infections. The woman was unsure of the time of such conduct but stated that it started after defendant had surgery on his arm. The abuse occurred in the mornings and the last incident occurred on a Monday. Gessler related the woman's allegations to Jeff Starr of the Major Unusual Incident Department. On cross-examination, Gessler admitted that a report prepared by her supervisor indicates that one of R.B.'s goals was to live independently.

[*P14] Investigator Jeff Starr testified that he met with Cable, Gessler and R.B. He then transported her to the Emergency Room at Southwest Hospital where they were met by North Royalton Police Officer Rybicki and later by Dr. Debra Russell.

[*P15] The woman indicated that she did not want to go home and Starr arranged for her to go to respite care. According to Starr, the woman was sad, crying, and afraid that her parents were going to be upset with her.

 [*P16] Officer Rybicki testified that she stayed with the woman in the

-3-

examination room. The woman was crying, shaking and would not let Rybicki leave.

 [*P17]  On cross-examination, Rybicki testified that she inventoried various items when a search warrant was conducted at defendant's home.

 [*P18]  Dr. Debra Russell testified that she examined the woman on November 6, 2002. The woman was upset and anxious and informed Russell that two days earlier, defendant put his private into her private. She asked him to stop and pushed his face away but he did not stop. She also stated that there were several other times during which defendant made her kiss his penis and other times during which he had kissed her genitals. The woman stated that defendant told her that he wanted to make her feel good before she went to work, and the woman kept repeating that she did not know why a father would do this to his daughter. Dr. Russell asked the woman if she knew what a condom is and she stated that she does and that defendant did not use condoms during sex.  The woman indicated in response to questioning that defendant hurt her "down there" but did not hit her.

 [*P19]  Dr. Russell further testified that the woman told her that when defendant makes her kiss his penis, white stuff comes out and she does not like the way it tastes so she spits it out into the sink.  Dr. Russell next learned that R.B. had brushed her teeth, showered, and washed her clothes since the incidents.  Dr. Russell asked the woman why she had not told her mother about the incidents and the woman became upset and anxious.  She expressed fear that her mother would get mad at her and would think that she is just making things up.

 [*P20]  Dr. Russell conducted a physical examination of the woman and noted that the woman had tenderness and mild swelling of the vagina and vaginal walls. There was no infection.  There was tenderness, redness and inflammation of the cervix, or area beyond the vagina.  According to Dr. Russell, redness and swelling of the vaginal area are indicative of injury to the tissues.

[*P21]  On cross-examination, Dr. Russell stated that the findings could be caused by masturbation only if the person masturbates to the point of hurting herself and were not consistent with frequent masturbation.  She also indicated that the finding of tenderness was based on the woman's complaints but the inflammation was from some form of trauma.

[*P22]  North Royalton Police Det. James Gross testified that he met with Officer Rybicki and Jeff Starr and obtained a search warrant for defendant's home.  The officers removed various items of clothing and bedding and then interviewed defendant.  Defendant told the officers that he adopted R.B. and her brother and that he and R.B.'s mother have two biological children together.  Defendant told

-4-

the police that R.B. functions at the level of a twelve year-old and that she is friendly with strangers and hyperactive.  Defendant stated that the officers would find no physical evidence of any sexual assault and that he believed that Nathaniel Hart was somehow behind the allegations.  Defendant admitted to Det. Gross, however, that he is responsible for waking R.B. after his wife goes to work, and that R.B. has seen him naked.

[*P23]  No evidence was recovered from the items taken pursuant to the search warrant.

[*P24]  At the close of the state's case, defendant's trial counsel moved to dismiss counts Two through Six, Eight through Twelve, Fourteen through Eighteen, and Twenty through Twenty-Four.  The trial court denied the motion and defendant elected to present evidence.

[*P25]  Diane Royle testified that she has known defendant and his wife since approximately 1970 and she sees the family at least once per month. Royle indicated that R.B.'s demeanor did not change at all in the time period from May 2002 until November 2002 and that she has never shown any signs of being afraid of defendant. Royle also testified that R.B.'s mother is protective of her and defendant is a gentleman.  She stated that R.B. functions at the preteen level but tries to do the things that her sisters do and that she has been known to stretch the truth.

[*P26]  Mary Rose Palfy, a direct care worker who has provided care for R.B. from September 2003 until December 2004, testified that R.B. would indicate that she had showered when she had not.  R.B.'s mother visited her weekly and brought snacks for her.  According to Palfy, R.B. would sometimes think that a male was looking at her and sometimes talked about getting her own place to live.

[*P27]  On cross-examination, Palfy admitted that R.B. had not seen her nieces and nephews since making the allegations at issue and that she misses them.

[*P28]  Michelle Schoenhofer testified that she provided respite care to R.B. and that R.B. lies, made comments about Schoenhofer's husband's body, and had once stared at his crotch.

[*P29]  Jean Brady, defendant's sister, testified that defendant is very patient with R.B. and taught her how to perform many household chores.  She further testified that R.B. tells stories, has always wanted to have her own place to live, and is flirtatious with men.

[*P30]  Heather Ginley, defendant's daughter, testified that the family included R.B. in its activities and also supported her participation in the Special Olympics

and other activities for mentally retarded people.  According to Ginley, R.B. has gotten increasingly difficult to be around and is frustrated at not doing the things that other family members can do.  She is extremely flirtatious around men and frequently gives out her phone number and address to strangers.

[*P31]  Ginley further testified that defendant had surgery on his arm in April 2002 which left him weak.  In July of 2002, after Ginley's daughter was born, she came over every morning for two weeks.  In addition, Ginley frequently stops at her parents' home.  In November 2002, Ginley and R.B. watched a movie about a girl who learned about sexual abuse at school then reported that her father had abused her.

[*P32]  On cross-examination, Ginley admitted that she had limited contact with R.B. immediately following the reporting of the allegations and that she has not let R.B. see her children since that time.

[*P33]  Dawn Connor, defendant's daughter, testified that R.B. has a hard time telling the truth, wants to be independent and touches herself inappropriately in public.  Connor asserted that defendant has had to wear an arm brace since his surgery and uses a device to keep it from swelling. Connor further testified that her children stay at defendant's home.  She admitted that she has not spoken to R.B. since her report of rape and no longer allows R.B. in her home.

[*P34]  Marge Brady, defendant's wife, testified that the family's lives were centered around R.B. and that defendant has been an extremely good father to her. Since being separated from her family, R.B. continues to ask about defendant.

[*P35]  Marge Brady also testified that R.B. has difficulty telling the truth, is inappropriate around boys and wants to be independent. R.B. had a lot of problems with yeast infections and frequently scratched her vaginal area in public and also masturbated in her bedroom.  Mrs. Brady also stated that R.B. is physically strong, strong-willed and cannot be made to do something she does not want to do.  She is also extremely fearful of doctors.

[*P36]  With regard to the items taken pursuant to the search warrant, Mrs. Brady stated that warrant was executed on a Wednesday and that the laundry was usually done on Fridays.

[*P37]  Defendant testified on his own behalf and stated that he and his wife were always attentive to R.B.'s grooming.  The woman caused them to worry following one incident when she was observed playing "grab ass" at a dance and another when she came home late.  According to defendant, the woman had a boyfriend named Bobby for about fifteen years.

[*P38]  Defendant admitted that he and the woman are alone in the mornings and that he is responsible for waking her up to get ready for work, but he asserted that the doors to the home are never locked and that friends frequently enter the home unannounced.

[*P39]  Defendant further testified that in May 2002, he had surgery for skin cancer in May 2002. Following the surgery, he had a drainage tube in his arm and wore a sling. At this time, R.B. helped him with his shoes and socks.

[*P40]  Defendant further testified that on the Monday before R.B. made the claim that she had been raped, he went to his sister's house at 9:30 a.m.  R.B. was still asleep so he called her on the phone to wake her.  He denied that he was with the woman and denied that they engaged in sexual conduct.  That Wednesday, he put summer clothes and luggage in the attic and R.B. helped him.  R.B. then went to work. Defendant and his wife went to a bar with friends later that night and became concerned when R.B. did not call them to say that she had arrived home. They then learned that the woman had been placed in respite care.  When the police subsequently executed a search warrant at their home, defendant indicated that if the woman had been raped, Nate Hart may have been the assailant.

[*P41]  Defendant stated that the woman functions at the level of a thirteen year-old and he did not believe that she understood the nature of the charges.  He opined that perhaps the woman raised the allegations in order to live on her own.

[*P42]  On cross-examination he acknowledged that he told police that Hart probably talked the woman into making the allegations.

[*P43]  Annette Byers, a house manager for Anthony Wayne Services, testified on rebuttal that R.B. fibs about hygiene issues but this is not uncommon when dealing with mentally retarded people.  R.B. comments about boys but her remarks are innocent.  She misses her family and did not have much contact with her mother while in respite care.

*State v. Brady*, 2007-Ohio-1453, 2007 Ohio App. LEXIS 1332 (Ohio Ct. App., Mar. 29, 2007).

## II.  Procedural History

### A.  Conviction

On April 3, 2004, a Cuyahoga County Grand Jury charged Brady with twelve counts of rape in violation of Ohio Revised Code ("O.R.C.") § 2907.02 and twelve counts of sexual battery in violation of O.R.C. § 2907.03.  (Doc. No. 6, Exh. 1.)  After a jury trial, Brady was found

-7-

guilty of two counts of rape, as charged in Counts One and Seven, and two counts of sexual

battery, as charged in Counts Thirteen and Nineteen.  (Doc. No. 6, Exh. 5.)  The jury acquitted

Brady of some charges, and the remaining charges were ultimately dismissed by the trial court.

*Id*.  On September 1, 2005, the trial court merged the two rape convictions and sentenced Brady

to a term of three years incarceration.  (Doc. No. 6, Exh. 6.)  The sexual battery convictions were

also merged for sentencing resulting in a one-year sentence.  *Id*.  The sentences were to be

served concurrently.  *Id*.

**B.    Direct Appeal**

On March 6, 2006, Brady, through new counsel, sought relief from the Court of Appeals

for the Eighth Appellate District ("state appellate court").  He raised seventeen assignments of

error.[1]  (Doc. No. 6, Exhs. 15 & 21.)

On March 29, 2007, the state appellate court affirmed Brady's conviction with one judge

dissenting.  Subsequently, Brady filed a Motion for Reconsideration and a Motion to Certify

Conflict, both of which were denied.  (Doc. No. 6, Exhs. 24-25, 28-29.)

Brady, through counsel, filed an appeal with the Supreme Court of Ohio raising fifteen

propositions of law.  (Doc. No. 6, Exh. 30.)   On October 3, 2007, the appeal was dismissed as

not involving any substantial constitutional question.  (Doc. No. 6, Exh. 32.)

**C.    Postconviction Relief**

While his direct appeal was pending before the state appellate court, Brady, on October 16,

2006, filed a Petition for Post-Conviction Relief alleging that he was not brought to trial in a

---

[1]  The state appellate court remanded the case to the trial court to specify which counts
were dismissed.  The trial court did so by way of a journal entry on December 11,
2006.  (Doc. No. 6, Exhs. 18 & 19.)

-8-

timely manner under Ohio's speedy trial statute and that counsel was ineffective for failing to raise the issue.  (Doc. No. 6, Exh. 33.)  Brady also alleged that counsel was ineffective for failing to call a character witness, failing to object to the court's force instruction, failing to object to the testimony of certain witnesses, and failing to object to the indictment.  (Doc. No. 6, Exh. 34.)  On November 29, 2006, the State filed a Motion for Summary Judgment, which the court granted on February 1, 2008.  (Doc. No. 6, Exhs. 35 & 38.)

**D.    Federal Habeas Petition**

On January 5, 2009, Brady filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

GROUND ONE: Mr. Brady was denied his right to speedy trial.

GROUND TWO: Mr. Brady was denied the effective assistance of counsel.

GROUND THREE: Mr. Brady was denied due process when the trial Court incorrectly instructed the jury regarding the element of force in Count One.

GROUND FOUR: The convictions on all counts were not supported by sufficient evidence.

GROUND FIVE: Mr. Brady was denied due process of law when the alleged victim was not made available for a mental examination but the State was allowed to provide evidence of her mental health and development from professional caregivers.

GROUND SIX: Mr. Brady was denied due process of law when he was not allowed to impeach the credibility of the alleged victim with evidence of prior lies and fabrications regarding sexual conduct.

GROUND SEVEN: Mr. Brady was denied due process of law when the trial Court refused to allow evidence of his good character to be admitted.

GROUND EIGHT: Mr. Brady was denied due process and the right to confrontation when the trial court admitted hearsay statements regarding the alleged victim's out-of-court accusations against him.

GROUND NINE: Mr. Brady was denied due process of law at trial by virtue of the vague and overlapping nature of the indictment and, further, by the lack of any assurance that the petit jury was instructed to be unanimous regarding the criminal conduct it believed he committed.

GROUND TEN: Mr. Brady was denied the right to a meaningful appeal by virtue of the vague and overlapping nature of the indictment.

GROUND ELEVEN: Count nineteen, forbidding sexual relations between a parent and child, is unconstitutional when applied to alleged sexual relations between Mr. Brady and an adult stepdaughter not related by consanguinity.

(Doc. No. 1.)

### III. Review on the Merits[2]

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

---

[2]  Brady's petition does not contain any legal arguments to support his allegations of constitutional violations, nor did he file a traverse.  "Unlike the generous notice-pleading standard for the benefit of ordinary civil plaintiffs under Federal Rule of Civil Procedure 8(a), ... Habeas Corpus Rule 2(c) requires habeas petitioners to 'specify all the grounds for relief available,' and to 'state the facts supporting each ground.'"  *Mayle v. Felix*, 545 U.S. 644, 669 (2005).  Brady barely mentions his claims for relief in his "Consolidated Statement In Support of Grounds For Relief" filed along with his petition.  (Doc. No. 1.) He makes vague references to testimony offered without objection and briefly mentions the jury instructions and the indictment.  He makes no effort to set forth the basis of his ineffective assistance of counsel claim.  *Id.*  Nonetheless, as Brady is proceeding *pro se*, "'his pleadings are held to a less stringent standard than those prepared by an attorney' and are liberally construed in his favor."  *Humphreys v. United States*, 238 Fed. Appx. 134, 138 (6th Cir. 2007) (*quoting Fazzini v. Northeast Ohio Corr. Ctr.*, 473 F.3d 229, 231 (6th Cir. 2006)).  As such, the Court shall attempt to interpret his claims based upon the entire record.

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts

-11-

defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

**A. Ground One: Speedy Trial**[3]

Brady asserts that he was denied his right to a speedy trial. (Doc. No. 1.) To the extent Brady is arguing that he was not brought to trial in compliance with Ohio's speedy trial statute – O.R.C. § 2945.71 *et seq.* – the claim is not cognizable upon federal habeas review. The statutory right to a speedy trial under Ohio law is not necessarily the same as the constitutional right to a speedy trial under the Sixth Amendment. *See Hunt v. Mitchell*, 261 F.3d 575, 584 (6th Cir. 2001). Claims based purely on state law are non-cognizable, as a federal court reviewing a habeas petition is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."); *Norris v. Schotten*, 146 F.3d 314, 329 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process.") (citations omitted). In *Norris*, the Sixth Circuit expressly found that "[i]t is especially inappropriate for a federal habeas court to set aside a state court's ruling on an issue of state law where, as in the present situation, Ohio's appellate courts on direct appeal have already found

---

[3] Respondent has argued that this ground for relief is unexhausted. (Doc. No. 6 at 16-1.) A petitioner can fairly present his claim to the state courts by "citing a provision of the Constitution, federal decisions employing Constitutional analysis, *or* state decisions employing Constitutional analysis in similar fact patterns." *Levine v. Trovik*, 986 F.2d 1506, 1515 (6th Cir. 1993) (emphasis added). Respondent contends that Brady, because he did not cite the United States Supreme Court's most prominent case on the matter, failed to raise a speedy trial claim. Nonetheless, Brady unequivocally argued that he was denied his rights under both the state statute and the Sixth and Fourteenth Amendments to the United States Constitution.

-12-

appellant's claim of a violation of his *statutory right to a speedy trial* to be meritless." *Id.* (emphasis added).

Brady also appears to argue that he was not brought to trial in compliance with the speedy trial provisions of the Sixth Amendment.  (Doc. No. 1.)  The state appellate court addressed only the state law component of Brady's argument and not the federal speedy trial claim.  *Brady*, 2008-Ohio-1543 at ¶¶45-51.  Because the merits of Brady's federal claim went unaddressed, this Court conducts a *de novo* review.  *See, e.g., Mickens v. Moore*, 2008 U.S. Dist. LEXIS 29156 (S.D. Ohio Apr. 9, 2008), *citing Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("when a claim has not been 'adjudicated on the merits in State court proceedings,' and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA"); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003); *Phillips v. Bradshaw*, 2006 U.S. Dist. LEXIS 75885 (N.D. Ohio 2006).

"A four-factor balancing test has been established by the Supreme Court to determine whether there has been a violation of an accused's constitutional right to a speedy trial.  These factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant."  *Norris v. Schotten*, 146 F.3d 314, 326 (6th Cir. 1998); *United States v. White*, 985 F.2d 271, 275 (6th Cir. 1993)).  Nonetheless, until a defendant suffers a delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *accord Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005) ("The length of the delay is a threshold requirement");  *Wilson v. Mitchell*, 250 F.3d 388, 394 (6th Cir. 2001) (delay is considered the "triggering" factor); *O'Dell*, 247 F.3d at 667 (same).

Brady was arrested on November 7, 2003 and released the same day with no formal charges against him. *Brady*, 2007-Ohio-1453 at ¶¶47-49.  Brady was indicted on April 30, 2004, but the date he was taken into custody pursuant thereto is unclear from the record.  He was, however, released on bond following his arraignment on May 12, 2004.  *Id*.  The length of delay is measured from the earlier of the date of indictment or the date a defendant was arrested and held to answer.  *See United States v. Marion*, 404 U.S. 307, 321 (1971).  Nonetheless, "[t]he Speedy Trial Clause does not purport to protect a defendant from all effects flowing from a delay before trial [and] does not, for example, limit the length of a pre-indictment criminal investigation even though 'the [suspect's] knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life.'"  *United States v. Loud Hawk*, 474 U.S. 302, 311-312 (1986).  Thus, the Speedy Trial Clause was not implicated herein until Brady was indicted as he suffered no restraints between the time he was released after his initial arrest until the indictment was filed.  The length of the delay between Brady's indictment and the commencement of his trial amounts to nearly fifteen months.  Generally, "a delay that approaches one year is considered presumptively prejudicial."  *Norris*, 146 F.3d at 327.  Thus, the Court will proceed to a balancing of the other factors.

Though the delay between indictment and trial was somewhat lengthy, the remaining factors from the Supreme Court's *Barker* decision weigh against Brady.  First, Brady knowingly waived his speedy trial right in open court, in two separate waivers, between the dates of January 1, 2005 and August 31, 2005.[4]  (Doc. No. 6, Exhs. 3 & 4.)  Without counting this time period,

---

[4] Both waivers occurred while Brady was represented by counsel and contain defense counsel's attestation that: (1) Brady understood his speedy trial rights; (2) he understood the consequences of waiving those rights; (3) he waived his rights knowingly,

the delay is reduced to eight months.  Furthermore, the state appellate court found that Brady had

also requested seventeen continuances during the matter – a finding that this Court has no reason

to doubt and which Brady has not challenged.  *Brady*, 2007-Ohio-1453 at ¶50.  Thus, the reasons

for delay are largely, if not wholly, attributable to Brady.  Finally, Brady has not identified any

prejudice stemming from the delay.  As such, Brady's first ground for relief should be denied.

## B.    Ground Three: Improper Jury Instructions

In ground three, Brady argues that he was denied due process when the trial court employed

an improper jury instruction.  (Doc. No. 1.)  Specifically, Brady objects to the following jury

instruction concerning force or the threat of force as it related to his rape conviction:

> Force means any violence, compulsion or constraint physically exerted by any
> means upon or against a person or thing.
>
> When the relationship between the victim and defendant is one of child and
> parent, the element of force need not be openly displayed or physically brutal. It
> can be subtle or slight and psychological or emotionally powerful. Evidence of an
> expressed threat of harm or evidence of significant physical restraint is not
> required. If you find beyond a reasonable doubt that under the circumstances in
> evidence that the victim's will was overcome by fear or duress or intimidation,
> the element of force has been proved.

(Tr. 631-32.)

Brady did not object to the jury instruction at trial.  *Brady*, 2007-Ohio-1453 at ¶58.  The

state appellate court found that the instruction was correct based on the Ohio Supreme Court's

decision in *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (Ohio 1992).  *Id*. at ¶¶60-63.  In

*Eskridge*, the Ohio Supreme Court found that there is "coercion inherent in parental authority

when a father sexually abuses his child. ... Force need not be overt and physically brutal, but can

---

intelligently, and voluntarily; and (4) no threats or promises were made to induce Brady's
waiver.  (Doc. No. 6, Exhs. 3 & 4.)

be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." 38 Ohio St. 3d at 58-59 (internal quotations omitted). Brady argues that *Eskridge* is inapposite because the victim herein was forty-two years old, albeit with the mental capacities of a thirteen or fourteen year old. The state appellate court disagreed and specifically held that "the rule of *Eskridge* [is] applicable however, as [the victim] is mentally retarded and functions at approximately the thirteen or fourteen year-old level, she lived with [Brady] and [he] was in a position of authority over her." *Brady*, 2007-Ohio-1453 at ¶63. This Court cannot find that the state appellate court's decision constitutes an incorrect application of state law.[5] Absent any error of state law, Brady cannot demonstrate that he was deprived of a fundamentally fair trial. As such, his third ground for relief is without merit.

## C.  Ground Four: Sufficiency of the Evidence

Brady asserts that none of his convictions are supported by sufficient evidence. (Doc. No. 1.) The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363-64 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317

---

[5] It bears noting that in *State v. Dye*, 82 Ohio St. 3d 323, 329,695 N.E.2d 763 (Ohio 1998), the Supreme Court of Ohio held that "a person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint."

(1979). In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *Id*.; *see also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record . . . should be resolved in favor of the prosecution." *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir. 1993) (*citing Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.))

Brady was convicted of two counts of rape and two counts of sexual battery. The first rape he was convicted of committing by force or threat of force. The state appellate court found as follows:

> As to the sufficiency of the evidence of force, R.B. testified that defendant approached her as she was getting dressed and told her that she had time and did not have to get dressed. The woman told defendant that she did not want to have sex but he took off his towel then kissed her vagina then inserted his penis into her. She also told Dr. Russell that defendant made her kiss his private part and that she tells him "not to" but he makes her do it to feel good about going to work. The evidence further indicated that the woman functions at the level of a youngster, that she lived with defendant and that he had parental authority over her. We therefore conclude that any rational factfinder, after viewing the evidence in a light most favorable to the state, could have found the essential element of force proven beyond a reasonable doubt.

*Brady*, 2007-Ohio-1453 at ¶64.

The state appellate court clearly identified the correct standard. Based on the Ohio Supreme Court's definition of force in *Eskridge*, the court found that the victim's testimony, and that of others regarding her mental functioning, was sufficient to allow a rational trier of fact to find the force element of rape was met beyond a reasonable doubt. This finding does not

constitute an unreasonable application of clearly established federal law.

Brady was also convicted of a second rape and two sexual batteries. All three convictions contained the element of sexual conduct with a person whose mental capacity was impaired due to a mental or physical condition that was known to Brady. Brady's argument appears to be based on his belief that the victim functioned at a level no lower than a thirteen year-old and that, under Ohio law, a thirteen-year old can consent to or resist sexual conduct. (Doc. No. 6, Exh. 21 at 26.) The state appellate court found as follows:

> [*P76] Within these assignment of error, defendant claims that the woman functions above the level at or above a thirteen year-old. He notes that this is the age at which the law determines that one is able to consent to sexual conduct and notes that the woman has had jobs. He therefore claims that there is insufficient evidence that her ability to resist was impaired due to her mental retardation.

> [*P77] R.C. 2907.03(A)(2) provides that "no person shall engage in sexual conduct with another, not the spouse of the offender, when * * * the offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."

> [*P78] The relevant question is whether the woman's ability to appraise the nature of her conduct was diminished. R.C. 2907.02(A)(1)(c); R.C. 2907.03; *State v. Ferguson* (May 25, 200), Franklin App. No. 99AP-819, 2000 Ohio App. LEXIS 2208. Substantial impairment does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim, and by allowing the trier of fact to do its own assessment of the person's ability to appraise or control his or her conduct. *State v. Robinson*, Summit App. No. 21317, 2003 Ohio 5360; *State v. Hillock*, Harrison App. No. 02-538-CA, 2002 Ohio 6897; *State v. Tate* (Oct. 26, 2000), Cuyahoga App. No. 77462, 2000 Ohio App. LEXIS 4960.

> [*P79] In this matter the jury was able to assess R.B.s ability to appraise or control her conduct. In addition, the state's evidence demonstrated that the woman functions at the level of a thirteen or fourteen year-old. Defendant's witness Royle opined that she functioned at the preteen level. It is undisputed that the woman could never drive, cook, manage money or live independently. This evidence was sufficient to enable reasonable minds to reach different conclusions as to whether her ability to appraise the nature of or control her conduct was substantially impaired. (Citations omitted).

-18-

*Brady*, 2007-Ohio-1453 at ¶¶76-79.

Again, the state appellate court clearly identified the correct standard.  Based on Ohio's statutory definition of substantial impairment, the court found that the victim's ability to appraise the nature of her conduct could be reasonably demonstrated by the testimony of the victim, as well as others who interacted with her.  While there were some discrepancies in the testimony as to the victim's level of mental functioning, the jury was not bound to give more weight to the testimony of one witness over another.  As such, there was sufficient evidence to allow a rational trier of fact to find that Brady engaged in sexual conduct with a person whose mental capacity was impaired due to a mental or physical condition that was known to him.  Therefore, the state appellate court's finding constitutes a reasonable application of clearly established federal law. Ground four of the petition is not well taken.

**D.    Grounds Five Six, and Seven: Evidentiary Issues**

In ground five, six, and seven, Brady argues that his right to Due Process was violated as a result of various evidentiary rulings made by the trial court.  (Doc. No. 1.)  Specifically, Brady identifies the following alleged errors: (1) the State was allowed to provide evidence of the victim's mental health despite her not being made available for mental examination to the defense;[6] (2) the court barred Brady from impeaching the victim by way of evidence of prior lies concerning sexual conduct; and (3) the court refused to allow the admission of evidence tending

_____

[6] Under Ohio law, "[w]hen the mental condition of the victim-potential witness is a contested, essential element of the crime charged, the defense may move the court that the state be barred from utilizing evidence of such mental condition obtained in a clinical interview of the witness prior to trial, unless such witness voluntarily agrees to a court-appointed, independent examination with the results being made available to both sides."  *State v. Zeh*, 31 Ohio St. 3d 99, 509 N.E.2d 414 (Ohio 1987).

to show Brady's good character.  *Id*.

It is well-established that alleged trial court errors in the application of state procedures or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable grounds for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68; *Serra v. Michigan Dep't. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Instead, questions concerning the admissibility of evidence, as well as its probative or prejudicial value, are properly left to the sound discretion of the trial court.  *See Oliphant v. Koehler*, 594 F.2d 547, 555 (6th Cir. 1979); *Johnson v. Karnes*, 198 F.3d 589, 593 (6th Cir. 1999) ("[A]n inquiry as to whether evidence was properly admitted or improperly excluded under state law 'is no part of a federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (citations omitted).  Only where the admission of the disputed evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal rights" may it provide grounds for granting a writ of habeas corpus. *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).

According to the state appellate court, Brady conceded that the State did not actually offer into evidence the results of any clinical interview regarding the victim's mental condition.  2007-Ohio-1453 at ¶95.  The court also disagreed that the medical professionals who testified were expert witnesses and, instead, found that they were more properly characterized as *fact* witnesses who testified regarding their role in dealing with and treating the victim.  *Id*.  After reviewing the trial transcript, it is clear that the medical professionals who testified did not do so in the capacity of mental health experts.  Both psychologist assistant Lisa Gessler and Debra Russell, M.D., spoke to the victim immediately after the allegations against Brady came to light.  They

-20-

testified primarily concerning their observations, and not about the victim's mental capacity. As the trial court's evidentiary ruling was not erroneous under state law, Brady's trial cannot have been rendered fundamentally unfair by the admission of the testimony.

With respect to Brady's claim that he was improperly barred from impeaching the victim by way of evidence of prior lies concerning sexual conduct, the state appellate court found no error in the trial court's ruling. Based on Ohio Supreme Court precedent, the state appellate court ruled that prior false allegations of sexual assault are "an entirely collateral matter which may not be proved by extrinsic evidence." *Brady*, 2007-Ohio-1453 at ¶107 (*quoting State v. Boggs*, 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (Ohio 1992). The state appellate court also noted that the trial court had reviewed records in camera and found that there was no allegation of rape or other sexual assault to be found in the records. *Id*. at ¶109.

Brady also was denied the opportunity to cross-examine the victim concerning lies about being pregnant and having an ultrasound performed. (Tr. 284.) The trial court disallowed such questions, but did allow the defense to inquire whether the victim had lied about undergoing a medical procedure to her co-workers. (Tr. 284-85.) The state appellate court concluded the questions were properly disallowed on the basis of Ohio's Rape Shield Law which prohibits "[e]vidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity ... unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." O.R.C. § 2907.02(D). Though it appears that Brady sought to introduce evidence of the

false pregnancy allegation for the purpose of impeaching the victim's credibility rather than to show the victim was sexually active, the state appellate court's ruling is not necessarily contrary to state law. Furthermore, the state appellate court noted that the trial court allowed the defense to elicit testimony that the victim had lied about having undergone a non-specific medical procedure, but found that the trial court's decision to bar any reference to the procedure as an ultrasound was not an abuse of discretion in light of the rape shield law. *Brady*, 2007-Ohio-1453 at ¶110. Absent any actual error, Brady cannot show that he was thereby deprived of a fundamentally fair trial.

Brady also claims that the trial court erred when it refused to allow two witnesses to answer whether he had deviant tendencies. The state appellate court found there was no error in barring such questions due to O.R.C. § 2907.02(D) which not only protects potential victim's from having their sexual activity used against them, but also bars "[e]vidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity ..." The statute expressly states that such evidence "shall not be admitted" unless it involves evidence indicative of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or the defendant's motive. *Id*. Even though it was Brady's counsel who sought to elicit evidence regarding his sexual tendencies, the State followed its applicable evidentiary rules, which prohibits such evidence. Since Brady has failed to establish that the above evidentiary rulings deprived him of due process and a fundamentally fair trial, grounds five, six, and seven are, therefore, without merit.

### E.    Ground Eight: Confrontation Clause

In ground eight, Brady argues that his right to confront the witnesses against him was violated when the victim's out of court statements were admitted at trial, through the testimony of psychology assistant Lisa Gessler and Debra Russell, M.D.

The Confrontation Clause of the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This guarantee applies to both federal and state prosecutions. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965). According to clearly established Supreme Court precedent, the Confrontation Clause bars the admission of "testimonial statements" made by persons who are not subject to cross-examination. The bar applies regardless of whether a hearsay exception would otherwise allow admission of the statements. *See Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) ("leav[ing] for another day any effort to spell out a comprehensive definition of 'testimonial'").[7] Assuming *arguendo* that Gessler and Dr. Russell repeated out-of-court statements made by the victim of a testimonial nature, there was, nonetheless, not a Confrontation Clause violation. Brady clearly had the opportunity to confront all witnesses, including the victim, at trial. Brady's counsel, in fact cross-examined Dr. Russell, Gessler, and the victim herself. (Tr. 264-81; 344-53; 396-402.) No decision of the United States Supreme Court has ever suggested that the Confrontation Clause requires excluding the out-of-court

---

[7] The *Crawford* decision overruled the Supreme Court's previous position concerning the Confrontation Clause as set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). According to the *Roberts* test, the admission of a statement from a non-testifying witness did not violate the Sixth Amendment if (1) the statement bore adequate indicia of reliability; and (2) the evidence (a) fell within a firmly rooted hearsay exception, or (b) bore particularized guarantees of trustworthiness.

statements of a witness where that same witness is available and testifying at trial. *Crawford*, 541 U.S. at 59, n. 9 (*citing California v. Green*, 399 U.S. 149, 162 (1970)). Under these circumstances, Brady's allegation that he was denied his right to confront the witnesses against him is untenable.

Brady also seems to argue that the admission of the victim's out-of-court statements, as related by Gessler and Dr. Russell, violated his due process rights because the statements, he suggests, constituted hearsay. During their testimony, both Gessler and Dr. Russell indicated that the victim had identified her father as the person who had engaged in sexual activity with her. (Tr. 333; 380.) The state appellate court found that the statements made by the victim to Dr. Russell were admissible, because they were made for the purpose of medical or psychological treatment. *Brady*, 2007-Ohio-1453 at ¶129. It also found that the statements made by the victim to Gessler were admissible, because they constituted excited utterances. *Id.* at ¶130. The Court need not decide whether the state appellate court correctly applied Ohio's Rules of Evidence, as "alleged errors of state evidentiary rules are not cognizable in habeas corpus cases," unless the improper application of the state law violates the petitioner's constitutional rights. *Rimmer-Rey v. Foltz*, 917 F.2d 25, 1990 WL 163265, *2 (6th Cir. 1990); *see also Moore v. Tate,* 882 F.2d 1107, 1109 (6th Cir. 1989). Assuming for the sake of argument that the statements constituted inadmissible hearsay, the admission of such testimony did not violate the Confrontation Clause because, as discussed above, the victim herself made the same allegation during her trial testimony and was subject to cross-examination.

Furthermore, Brady was not deprived of a fundamentally fair trial as the out-of-court statements of the victim, admitted through the testimony of Gessler and Dr. Russell, were merely

cumulative of the victim's own testimony.  Neither witness concluded that a rape actually

occurred.  In fact, Dr. Russell expressly stated that she could not testify whether a rape had

occurred because that would be a legal conclusion.  (Tr. 401-02.)  Also, though Gessler testified

about her investigation regarding the victim's propensity for fabricating stories, or lack thereof,

the trial court instructed the jury that it was their province alone to decide whether the victim

was credible.  (Tr. 339-42.)  Under these circumstances, this Court does not find that the

admission of the statements deprived Brady of a fundamentally fair trial.  As such, his ground for

relief is without merit.

**F.      Grounds Nine and Ten: "Overlapping" Indictment**

In ground nine, Brady asserts that he was denied Due Process by virtue of the "vague and

overlapping nature of the indictment."  In ground ten, he argues that he was denied the right to a

"meaningful appeal" due to the indictment's "overlapping" nature.  (Doc. No. 1.)  Before the

state appellate court, these grounds were argued in one assignment of error.  (Doc. No. 6, Exh.

21 at 34-36.)

First, it is well settled that the federal guarantee of a grand jury indictment does not apply to

the states.  *See, e.g., Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984) *(citing Branzburg v.*

*Hayes*, 408 U.S. 665 (1972)); *accord Riffel v. Erwin*, 2005 U.S. Dist. LEXIS 11666 (S.D. Ohio

2005).  In addition, "the Constitution does not require any particular state indictment rule ... [or]

an indictment at all if sufficient notice of the charges is given in some other manner."  *Id.* (*citing*

*Combs v. Tennessee*, 530 F.2d 695 (6th Cir.) *cert. denied*, 425 U.S. 954 (1976)).  Nevertheless,

the Due Process Clause of the Fourteenth Amendment requires that a state must give a criminal

defendant "fair notice" of the charges against him to permit adequate preparation of his defense.

-25-

*See Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir. 2006); *Koontz*, 731 F.2d at 369; *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977).  The fair notice requirement is met when a charged offense "[is] described with some precision and certainty so as to apprise the accused of the crime with which he stands charged."  *Id.*  "To pass constitutional muster, an indictment must meet a two-prong test: first, the indictment must set out all of the elements of the charged offense and must give notice to the defendant of the charges he faces; second, the indictment must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts."  *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992).  The United States Supreme Court has held as follows:

> It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *United States v. Carll*, 105 U.S. 611, 612 (1882).  "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  *United States v. Hess*, 124 U.S. 483, 487 (1888).

*Hamling v. United States*, 418 U.S. 87, 117-118 (1974); *accord United States v. McAuliffe*, 490 F.3d 526, 530 (6th Cir. 2007); *United States v. Jackson*, 327 F.3d 273, 290 (4th Cir. 2003).

It has not been argued that the indictment failed to give notice to Brady of the charges he faced.  Rather the Court construes Brady's argument as alleging that his indictment, due to the multiple identical charges contained therein, were not sufficiently specific to enable him to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.  The state appellate court found as follows:

> [*P139] To the extent that appellant argues the indictment was defective, he waived that argument by failing to raise it before trial.  *See* Crim.R. 12(C)(2);

*State v. Hardy*, Cuyahoga App. No. 82620, 2004 Ohio 56; *State v. Blalock*, Cuyahoga App. Nos. 80419 and 80420, 2002 Ohio 4580, P75.

[*P140]  As to whether the indictment was sufficient for defendant to challenge his convictions, we note that in *Valentine v. Konteh* (6th Cir. 2005), 395 F.3d 626, the Sixth Circuit determined that identical indictments violated the constitution because there were no distinctions made at any time during the trial to differentiate one incident of sexual abuse from another, to link each charge with a specific incident.  *See Valentine v. Konteh* (6th Cir. 2005), 395 F.3d 626.

[*P141]  Significantly, the *Valentine* Court noted that "the forty criminal counts were not anchored to forty distinguishable criminal offenses."  The Court stated:

[*P142] "In its charges and in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place. Instead, the 8-year-old victim described "typical" abusive behavior by Valentine and then testified that the "typical" abuse occurred twenty or fifteen times."

[*P143]  However, the *Valentine* Court specifically held that:

[*P144] "The due process problems in the indictment might have been cured had the trial court insisted that the prosecution delineate the factual bases for the forty separate incidents either before or during the trial." *Id.  Accord State v. Rice*, Cuyahoga App. No. 82547, 2005 Ohio 3393.

[*P145]  The *Valentine* Court also noted:

[*P146] "The deficient charging of the prosecution and the management failure of the trial court, however, should not disturb the verdicts for Count 1 (the first rape count) and Count 21 (the first felonious sexual penetration count) of this case. The prosecutor presented substantial evidence of ongoing abuse, against which Valentine had notice and opportunity to defend.  The jury heard the witnesses, evaluated the evidence, and was convinced of Valentine's guilt.  **Had this case been tried in two counts, the convictions would clearly stand.  Thus, any constitutional error with regard to the other 38 counts should not render invalid these two counts**."

*** 

[*P155]  Moreover, we must be mindful that in dealing with an offense against a mentally retarded person, a certain degree of inexactitude in averring the date of the offense is not necessarily fatal to its prosecution.  *State v. Shepherd*, Cuyahoga App. No. 81926, 2003 Ohio 3356.  This is especially relevant in this matter as the case proceeded to trial approximately three years after the alleged

-27-

incidents.

[*P156]  In this matter, the evidence indicated that the woman testified to the first incident which occurred after defendant had surgery and testified that when she was getting dressed defendant approached her wearing a towel and then raped her. The evidence also established another incident where defendant had the woman kiss his penis, a white substance came out, and she spit it into the sink. There was also evidence of an incident of vaginal rape which occurred two days before the woman reported the allegations.

[*P157]  Moreover, the trial court instructed the jurors that each of the charges constitutes a distinct and separate offense, and that they must consider each count separately. (Tr. 627, 638.)  In addition, the trial court merged the rape convictions for purposes of sentencing and merged the sexual battery convictions for purposes of sentencing.  Thus, defendant was convicted of a single count of rape and a single count of sexual battery.  *See State v. McGuire*, 80 Ohio St.3d 390, 399, 1997 Ohio 335, 686 N.E.2d 1112 (noting that a conviction consists of a verdict and a sentence).

[*P158]  Finally, the record indicates that the remaining twelve counts of the indictment, upon which the jurors were not able to agree, were later dismissed by the trial court on February 13, 2006.

*Brady*, 2007-Ohio-1453 (emphasis in original).

Under Ohio law, "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."  O.R.C. § 2941.25(A). Here as noted by the state appellate court, Brady's two rape convictions were merged as were his two convictions for sexual battery.  As such, under Ohio law, Brady was convicted of only one rape and one sexual battery. "  *State v. McGuire*, 80 Ohio St. 3d 390, 399, 686 N.E.2d 1112 (Ohio 1997) ("Allied offenses of similar import do not merge until sentencing, since a conviction consists of verdict and sentence.")  The state appellate court correctly identified the controlling law from *Valentine* and its application was not unreasonable.  In *Valentine*, the Sixth Circuit found that multiple convictions for identical charges that were left undifferentiated throughout

-28-

the state court proceedings violated due process.  395 F.3d at 636.  Nonetheless, the *Valentine* court sustained one count of child rape and one count of penetration, as there was sufficient testimony as to one instance of each.  *Id*. at 628.  Because Brady was not convicted of multiple, undifferentiated counts of the same offense, the state appellate court's ruling was reasonable and his grounds for relief are without merit.

**G.    Ground Eleven: Constitutionality of Ohio's Sexual Battery Statute**

Brady asserts that Ohio's sexual battery statute, as applied to his case, violates the United States Constitution because it criminalizes sexual relations between a stepparent and an adult stepdaughter not biologically related.  (Doc. No. 1.)  In his state appellate brief, Brady argued that his conviction runs afoul of the United States Supreme Court's decisions in *Griswold v. Connecticut*, 381 U.S. 479 (1965) and *Lawrence v. Texas*, 539 U.S. 558 (2003).  In *Griswold*, the Court found that the Constitution created a right of privacy implicit in the Third, Fourth, Fifth and Ninth Amendments.  The Court specifically found that a law banning contraceptives violated the right of marital privacy.  *Id*.; *see also Eisenstadt v. Baird*, 405 U.S. 438 (1972) (invalidating a law prohibiting the distribution of contraceptives to unmarried persons).  In *Lawrence*, the Supreme Court struck down a Texas law criminalizing "deviate sexual intercourse" with another individual of the same sex.  539 U.S. 558.  The Court, however, also noted as follows:

> The present case does not involve minors.  *It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused*.  It does not involve public conduct or prostitution.  It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.  The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.  The petitioners are entitled to respect for their private lives.  The State cannot demean their existence or control their destiny by making their private sexual conduct a crime.  Their right to liberty under the Due Process Clause gives them the full right to engage in their

-29-

conduct without intervention of the government.

*Id*. at 578 (emphasis added). The state appellate court rejected Brady's argument observing that Ohio's statute is within constitutional requirements. 2007-Ohio-1453 at ¶169. There is no clearly established Supreme Court precedent that allows a person to engage in sexual relations with another person beyond the age of majority who, by the most generous of accounts, had mental functioning no higher than a thirteen or fourteen-year old. Ohio's statute occupies territory where states are free to legislate. As such, the state appellate court's decision was not contrary to clearly established federal law.

**H.    Ground Two: Ineffective Assistance of Counsel**

Brady has also argued that he was denied the effective assistance of trial counsel. (Doc. No. 1; Doc. No. 6, Exh. 21 at 39-40.)

To establish ineffective assistance, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985). A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair. *Id*. To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th

Cir. 1992).

Brady does not elaborate on his allegation that counsel was ineffective.  In his state court filings, Brady argued that counsel was ineffective for failing to call a character witness, failing to object to the court's force instruction, failing to object to the testimony of certain witnesses, failing to object to the indictment, failing to raise a speedy trial claim, and failing to raise the evidentiary issues contained in grounds five, six, seven, and eight.  The state appellate court addressed all the underlying claims and found that there was no error.  *Brady*, 2007-Ohio-1453 at ¶174.  Consequently, the state appellate court found Brady's trial counsel could not have been ineffective for failing to raise meritless challenges or objections.  *Id*.  This Court has also addressed these same arguments and found them all to be lacking in merit.  Brady has not established error in the state court's evidentiary rulings or jury instructions.  Furthermore, even if some rulings were erroneous, the trial itself was not fundamentally unfair.  Also, Brady's speedy trial claim is wholly without merit.  As such, trial counsel's failure to raise a meritless motion or frivolous objection cannot reasonably be construed as to have affected the outcome of the matter. Thus, the state appellate court's decision was not an unreasonable application of clearly established federal law rendering ground two meritless.

## IV.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends Brady's Petition be DENIED.

s/ Greg White_____
U.S. MAGISTRATE JUDGE


Date: September 15, 2009

-31-

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).