UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-----------------------------------------------------
                                                   :
JAMES BRADY,                                       :
                                                   :        CASE NO. 1:09-CV-09
                         Petitioner,               :
                                                   :
      v.                                            :        OPINION & ORDER
                                                   :        [Resolving Doc. Nos. 1, 6, 7, & 13]
TERRY COLLINS, *Director*,                          :
                                                   :
                         Respondent.               :
                                                   :
-----------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

      On January 5, 2009, Petitioner James Brady filed a petition for a writ of habeas corpus under

28 U.S.C. § 2254.  [Doc. 1.]  With his petition, Brady seeks relief from his Ohio convictions for the

rape and sexual battery of his mentally-disabled, forty-one-year-old step-daughter.  Respondent Terry

Collins, director of the Ohio Department of Rehabilitation and Correction, opposes the petition.

[Doc. 6.]

      On September 15, 2009, Magistrate Judge Greg White recommended that this Court deny

Brady's petition. [Doc. 7.] Brady objects to most of the Magistrate Judge's Report and

Recommendation. [Doc. 13.] For the following reasons, the Court **ADOPTS** the Magistrate Judge's

Report and Recommendation and **DENIES** Brady's petition for a writ of habeas corpus.

### I.  Background

      On April 3, 2004, a Cuyahoga County grand jury indicted Petitioner Brady on twelve counts

of rape and twelve counts of sexual battery.  The jury ultimately convicted Brady on two counts of

Case No. 1:09-CV-09
Gwin, J.

rape—Counts One and Seven—and two counts of sexual battery—Counts Thirteen and Nineteen.

On September 5, 2005, the trial court merged the two rape convictions and sentenced Brady to three

years of incarceration.  The trial court also merged the two sexual battery convictions and sentenced

Brady to one year of incarceration, concurrent with the three year sentence.

On March 6, 2006, Petitioner Brady directly appealed his convictions, raising seventeen

assignments of error.  The state court of appeals, referring to the victim as "R.B.," summarized the

facts of the case as follows:

> {¶ 4} The state presented the testimony of the woman, R.B., who was born in 1961.
> In 2002, when she still resided with her mother and her stepfather, defendant, R.B.
> worked on a maintenance crew at Frommer ATC and her boss was Nate Hart. She
> generally took a cab to work, and worked from 1:00 p.m. until 7:00 p .m.

> {¶ 5} The woman testified that her mother left early in the morning to go to work and
> defendant would generally wake her up. When she was getting out of the bathtub, and
> was getting dressed, defendant approached her. He was wearing just a snap robe and
> told her that she had time and did not have to get dressed. The woman told defendant
> that she did not want to have sex but he took off his towel then kissed her vagina then
> inserted his penis into her. She testified that defendant has a big penis. The woman
> further testified that some "white stuff came out" and she became scared. She took
> a shower to try to get the white stuff off of her then told defendant to go into his
> bedroom so she could get ready for work. Defendant told the woman that this would
> make her feel good to go to work and would calm her down.

> {¶ 6} The woman also testified to another incident when defendant had her kiss his
> penis and told her it would make him feel good. She testified that a liquid came out
> of his penis. R.B. stated that the white stuff tasted yucky so she spit it out in the
> toilet, but some was around his penis and on the sheets.

> {¶ 7} The woman testified that she tried to talk to Nate Hart about what had
> happened but felt uncomfortable and asked him if she could speak with a female. She
> then spoke to Lisa Gessler and reported that defendant put his penis inside of her.
> The woman had difficulty remembering but stated that defendant put his penis in her
> twice.

> {¶ 8} On cross-examination, the woman acknowledged that she had sent her father
> cards. She also admitted that she saw her doctor in September 2002 but did not tell

-2-

Case No. 1:09-CV-09
Gwin, J.

her of any abuse. The woman stated that she watches soap operas and that shortly before her disclosure to Gessler she had watched a movie about a woman who accused someone of rape. She also stated that she had taken a class on sex education in which she had learned the words penis and vagina. She stated on redirect examination, however, that she knew the difference between the truth and a lie and that she had told the truth.

{¶ 9} Nathaniel Hart testified that he works for the Cuyahoga County Department of Mental Retardation and that he supervises a cleaning crew which included R.B. Hart testified that the woman appeared to enjoy her job and talked to the other workers but by the summer of 2002, she had "an attitude" and began protesting her job assignments. The woman became fearful and cried when it was time to go home but she did not allow Hart to call her parents. She yelled and rocked while Hart drove the workers home. She told Hart that she did not want to go home but would not tell him the reason.

{¶ 10} Hart informed his supervisor, Jim Cable, of the woman's behavior and Cable arranged for her to have a consultation in the psychiatric department. Since making the disclosure, the woman has lost a lot of weight, is tearful, and has panic attacks. She sometimes lies then quickly recants her lies.

{¶ 11} Jim Cable testified that Hart is one of his best employees. He further testified that R.B. functions at the level of a younger adolescent, i.e., in the range of a thirteen or fourteen year-old.

{¶ 12} R.B.'s general demeanor was friendly, bubbly and pleasant. Cable later learned that R.B. was upset, so he spoke with her. She became teary-eyed but would not talk. Cable asked if she wanted to speak with a female and she replied that she did. The next day, R.B. spoke to psychologist Lisa Gessler and Gable found an emergency placement for her. Since this time, the woman's demeanor is now bitter and sad and she is difficult to work with

.

{¶ 13} Lisa Gessler testified that the woman was crying heavily when they met so Gessler gave her gum in an effort to stop her from sobbing. The woman told Gessler that her father touches her "down below" and that she tells him "no." R.B. then related an incident which occurred near the shower. She also told Gessler that she was worried about being pregnant because defendant does not use a condom. She further stated that defendant "does it hard" and she keeps getting infections. The woman was unsure of the time of such conduct but stated that it started after defendant had surgery on his arm. The abuse occurred in the mornings and the last incident occurred on a Monday. Gessler related the woman's allegations to Jeff Starr of the Major Unusual Incident Department. On cross-examination, Gessler admitted that a report prepared by her supervisor indicates that one of R.B.'s goals was to live

-3-

Case No. 1:09-CV-09
Gwin, J.

independently.

{¶ 14} Investigator Jeff Starr testified that he met with Cable, Gessler and R.B. He then transported her to the Emergency Room at Southwest Hospital where they were met by North Royalton Police Officer Rybicki and later by Dr. Debra Russell.

{¶ 15} The woman indicated that she did not want to go home and Starr arranged for her to go to respite care. According to Starr, the woman was sad, crying, and afraid that her parents were going to be upset with her.

{¶ 16} Officer Rybicki testified that she stayed with the woman in the examination room. The woman was crying, shaking and would not let Rybicki leave.

{¶ 17} On cross-examination, Rybicki testified that she inventoried various items when a search warrant was conducted at defendant's home.

{¶ 18} Dr. Debra Russell testified that she examined the woman on November 6, 2002. The woman was upset and anxious and informed Russell that two days earlier, defendant put his private into her private. She asked him to stop and pushed his face away but he did not stop. She also stated that there were several other times during which defendant made her kiss his penis and other times during which he had kissed her genitals. The woman stated that defendant told her that he wanted to make her feel good before she went to work, and the woman kept repeating that she did not know why a father would do this to his daughter. Dr. Russell asked the woman if she knew what a condom is and she stated that she does and that defendant did not use condoms during sex. The woman indicated in response to questioning that defendant hurt her "down there" but did not hit her.

{¶ 19} Dr. Russell further testified that the woman told her that when defendant makes her kiss his penis, white stuff comes out and she does not like the way it tastes so she spits it out into the sink. Dr. Russell next learned that R.B. had brushed her teeth, showered, and washed her clothes since the incidents. Dr. Russell asked the woman why she had not told her mother about the incidents and the woman became upset and anxious. She expressed fear that her mother would get mad at her and would think that she is just making things up.

{¶ 20} Dr. Russell conducted a physical examination of the woman and noted that the woman had tenderness and mild swelling of the vagina and vaginal walls. There was no infection. There was tenderness, redness and inflammation of the cervix, or area beyond the vagina. According to Dr. Russell, redness and swelling of the vaginal area are indicative of injury to the tissues.

{¶ 21} On cross-examination, Dr. Russell stated that the findings could be caused by

-4-

Case No. 1:09-CV-09
Gwin, J.

masturbation only if the person masturbates to the point of hurting herself and were not consistent with frequent masturbation. She also indicated that the finding of tenderness was based on the woman's complaints but the inflammation was from some form of trauma.

{¶ 22} North Royalton Police Det. James Gross testified that he met with Officer Rybicki and Jeff Starr and obtained a search warrant for defendant's home. The officers removed various items of clothing and bedding and then interviewed defendant. Defendant told the officers that he adopted R.B. and her brother and that he and R.B.'s mother have two biological children together. Defendant told the police that R.B. functions at the level of a twelve year-old and that she is friendly with strangers and hyperactive. Defendant stated that the officers would find no physical evidence of any sexual assault and that he believed that Nathaniel Hart was somehow behind the allegations. Defendant admitted to Det. Gross, however, that he is responsible for waking R .B. after his wife goes to work, and that R.B. has seen him naked.

{¶ 23} No evidence was recovered from the items taken pursuant to the search warrant.

{¶ 24} At the close of the state's case, defendant's trial counsel moved to dismiss counts Two through Six, Eight through Twelve, Fourteen through Eighteen, and Twenty through Twenty-Four. The trial court denied the motion and defendant elected to present evidence.

{¶ 25} Diane Royle testified that she has known defendant and his wife since approximately 1970 and she sees the family at least once per month. Royle indicated that R.B.'s demeanor did not change at all in the time period from May 2002 until November 2002 and that she has never shown any signs of being afraid of defendant. Royle also testified that R.B.'s mother is protective of her and defendant is a gentleman. She stated that R.B. functions at the preteen level but tries to do the things that her sisters do and that she has been known to stretch the truth.

{¶ 26} Mary Rose Palfy, a direct care worker who has provided care for R.B. from September 2003 until December 2004, testified that R.B. would indicate that she had showered when she had not. R.B.'s mother visited her weekly and brought snacks for her. According to Palfy, R.B. would sometimes think that a male was looking at her and sometimes talked about getting her own place to live.

{¶ 27} On cross-examination, Palfy admitted that R.B. had not seen her nieces and nephews since making the allegations at issue and that she misses them.

{¶ 28} Michelle Schoenhofer testified that she provided respite care to R.B. and that

Case No. 1:09-CV-09
Gwin, J.

R.B. lies, made comments about Schoenhofer's husband's body, and had once stared at his crotch.

{¶ 29} Jean Brady, defendant's sister, testified that defendant is very patient with R.B. and taught her how to perform many household chores. She further testified that R.B. tells stories, has always wanted to have her own place to live, and is flirtatious with men.

{¶ 30} Heather Ginley, defendant's daughter, testified that the family included R.B. in its activities and also supported her participation in the Special Olympics and other activities for mentally retarded people. According to Ginley, R.B. has gotten increasingly difficult to be around and is frustrated at not doing the things that other family members can do. She is extremely flirtatious around men and frequently gives out her phone number and address to strangers.

{¶ 31} Ginley further testified that defendant had surgery on his arm in April 2002 which left him weak. In July of 2002, after Ginley's daughter was born, she came over every morning for two weeks. In addition, Ginley frequently stops at her parents' home. In November 2002, Ginley and R.B. watched a movie about a girl who learned about sexual abuse at school then reported that her father had abused her.

{¶ 32} On cross-examination, Ginley admitted that she had limited contact with R.B. immediately following the reporting of the allegations and that she has not let R.B. see her children since that time.

{¶ 33} Dawn Connor, defendant's daughter, testified that R.B. has a hard time telling the truth, wants to be independent and touches herself inappropriately in public. Connor asserted that defendant has had to wear an arm brace since his surgery and uses a device to keep it from swelling. Connor further testified that her children stay at defendant's home. She admitted that she has not spoken to R.B. since her report of rape and no longer allows R.B. in her home.

{¶ 34} Marge Brady, defendant's wife, testified that the family's lives were centered around R.B. and that defendant has been an extremely good father to her. Since being separated from her family, R.B. continues to ask about defendant.

{¶ 35} Marge Brady also testified that R.B. has difficulty telling the truth, is inappropriate around boys and wants to be independent. R.B. had a lot of problems with yeast infections and frequently scratched her vaginal area in public and also masturbated in her bedroom. Mrs. Brady also stated that R.B. is physically strong, strong-willed and cannot be made to do something she does not want to do. She is also extremely fearful of doctors.

Case No. 1:09-CV-09
Gwin, J.

{¶ 36} With regard to the items taken pursuant to the search warrant, Mrs. Brady stated that warrant was executed on a Wednesday and that the laundry was usually done on Fridays.

{¶ 37} Defendant testified on his own behalf and stated that he and his wife were always attentive to R.B.'s grooming. The woman caused them to worry following one incident when she was observed playing "grab ass" at a dance and another when she came home late. According to defendant, the woman had a boyfriend named Bobby for about fifteen years.

{¶ 38} Defendant admitted that he and the woman are alone in the mornings and that he is responsible for waking her up to get ready for work, but he asserted that the doors to the home are never locked and that friends frequently enter the home unannounced.

{¶ 39} Defendant further testified that in May 2002, he had surgery for skin cancer in May 2002. Following the surgery, he had a drainage tube in his arm and wore a sling. At this time, R.B. helped him with his shoes and socks.

{¶ 40} Defendant further testified that on the Monday before R.B. made the claim that she had been raped, he went to his sister's house at 9:30 a.m. R.B. was still asleep so he called her on the phone to wake her. He denied that he was with the woman and denied that they engaged in sexual conduct. That Wednesday, he put summer clothes and luggage in the attic and R.B. helped him. R.B. then went to work. Defendant and his wife went to a bar with friends later that night and became concerned when R.B. did not call them to say that she had arrived home. They then learned that the woman had been placed in respite care. When the police subsequently executed a search warrant at their home, defendant indicated that if the woman had been raped, Nate Hart may have been the assailant.

{¶ 41} Defendant stated that the woman functions at the level of a thirteen year-old and he did not believe that she understood the nature of the charges. He opined that perhaps the woman raised the allegations in order to live on her own.

{¶ 42} On cross-examination he acknowledged that he told police that Hart probably talked the woman into making the allegations.

{¶ 43} Annette Byers, a house manager for Anthony Wayne Services, testified on rebuttal that R.B. fibs about hygiene issues but this is not uncommon when dealing with mentally retarded people. R.B. comments about boys but her remarks are innocent. She misses her family and did not have much contact with her mother while in respite care.

Case No. 1:09-CV-09
Gwin, J.

*State v. Brady*, No. 87854, 2007 WL 926365, *1-6 (Ohio Ct. App. 2007). On March 29, 2007, the appeals court affirmed Brady's conviction. On October 3, 2007, the Supreme Court of Ohio refused to hear the case.

On October 16, 2006, and during the pendency of his direct appeal, Brady also filed a petition for state post-conviction relief. With this petition, Brady sought relief under Ohio's speedy trial statute and claimed ineffective assistance of counsel. The post-conviction court granted judgment against Brady on February 1, 2008.

Finally, on January 5, 2009, Brady filed pro se the instant Petition for Writ of Habeas Corpus. With his Petition, Brady asserts eleven grounds for relief, including ineffective assistance of counsel, denial of due process, and insufficient evidence to convict. On September 15, 2009, Magistrate Judge Greg White recommended that this Court deny Brady's petition on each ground. [Doc. 7.] On November 13, 2009, Brady—now represented by counsel—filed objections to the report and recommendation, disputing all but one of the Magistrate Judge's recommendations. [Doc. 13.]

## II. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), governs a federal court's review of a state prisoner's habeas corpus petition. AEDPA limits federal review to only those claims in which a petitioner contends that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). AEDPA provides that federal courts cannot grant a habeas petition for any claim that the state court adjudicated on the merits unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

Case No. 1:09-CV-09
Gwin, J.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  *See also* *Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

To justify a grant of habeas relief under the "contrary to" clause, "a federal court must find a violation of law 'clearly established' by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision." *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  Meanwhile, under the 'unreasonable application' clause, "a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413.  The Sixth Circuit holds that, even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable.  *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

Where a state court did not adjudicate a federal constitutional claim on the merits, however, AEDPA deference does not apply.  *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009); *Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008).  In such cases, a federal court applies the pre-AEDPA standard of review and reviews questions of law *de novo* and questions of fact for clear error. *Evans,* 575 F.3d at 564; *Brown*, 551 F.3d at 430; *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

### III.  Analysis

The magistrate judge recommended denial of Brady's petition on all eleven grounds.  In his objections, Petitioner Brady does not object to the magistrate judge's conclusion on Ground One but does object to his remaining recommendations.  The Court addresses each remaining ground in the order outlined in the Report & Recommendation.

### A. Ground Three: Improper Jury Instructions

Case No. 1:09-CV-09
Gwin, J.

With this ground for relief, Petitioner Brady argues that the trial court denied him due process when it improperly instructed the jury on "force." Specifically, as it related to the rape charge, the trial court instructed the jury:

> Force means any violence, compulsion or constraint physically exerted by any means upon or against a person or thing.
>
> When the relationship between the victim and defendant is one of child and parent, the element of force need not be openly displayed or physically brutal. It can be subtle or slight and psychological or emotionally powerful. Evidence of an expressed threat of harm or evidence of significant physical restraint is not required. If you find beyond a reasonable doubt that under the circumstances in evidence that the victim's will was overcome by fear or duress or intimidation, the element of force has been proved.

[Tr. at 631.] Because Brady did not object to the jury instruction at trial, the state appellate court reviewed the instruction for plain error. *Brady*, 2007 WL 926365, at *7. Relying on *State v. Eskridge*, 526 N.E.2d 304 (Ohio 1988) (finding that there is "coercion inherent in parental authority when a father sexually abuses his child. . . . Force need not be overt and physically brutal, but can be subtle and psychological"), the state court of appeals held the instruction in Brady's case proper.

Although Petitioner Brady labels his argument as one arising under due process, his challenge to this instruction is actually based on his belief that the instruction is a misstatement of Ohio law. [Doc. 13 at 15-17.] Even Petitioner's argument that the instruction relieved the State from proving all elements of the crime beyond a reasonable doubt is premised on a finding that Ohio law requires force to be proved in a particular manner.

Instead, as the state appeals court held, the Petitioner's proffered element is not in fact an element of the crime under Ohio law and no due process violation exists. Thus, "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v.*

Case No. 1:09-CV-09
Gwin, J.

*McGuire*, 502 U.S. 62, 71-72 (1991).  Accordingly, this Court denies Brady's petition on ground

three.

### B. Ground Four: Sufficiency of the Evidence

Petitioner Brady next claims that the evidence was insufficient to convict him for rape and

sexual battery.  The Sixth Circuit has recently clarified the "double layer of deference" this Court

gives to the state courts on insufficiency of the evidence habeas claims:

> First, as in all sufficiency-of-the-evidence challenges, we must determine whether,
> viewing the trial testimony and exhibits in the light most favorable to the prosecution,
> any rational trier of fact could have found the essential elements of the crime beyond
> a reasonable doubt. In doing so, we do not reweigh the evidence, re-evaluate the
> credibility of witnesses, or substitute our judgment for that of the jury. Thus, even
> though we might have not voted to convict a defendant had we participated in jury
> deliberations, we must uphold the jury verdict if any rational trier of fact could have
> found the defendant guilty after resolving all disputes in favor of the prosecution.
>
> Second, even were we to conclude that a rational trier of fact could not have found
> a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer
> to the state appellate court's sufficiency determination as long as it is not
> unreasonable.

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (internal citations omitted).  In making this first

determination, however, this Court must review the entire record of the trial, not simply the summary

of facts provided by the state courts. *Jeffries v. Morgan*, 522 F.3d 640, 644-45 (6th Cir. 2008).

With this framework in mind, the Court turns to Petitioner Brady's sufficiency of the

evidence challenges.  First, Brady argues that a rational trier of fact could not have found the element

of force necessary to convict him of rape as charged in count one. [Doc. 13 at 18.]  In support, he

says both that the evidence did not establish physical coercion and that the evidence did not establish

that the victim's conduct permitted the relaxed "parent-child" standard for force in Ohio. *See*

*Eskridge*, 526 N.E.2d at 306 ("With the filial obligation of obedience to the parent, the same degree

-11-

Case No. 1:09-CV-09
Gwin, J.

of force and violence would not be required upon a person of such tender years, as would be required were the parties more nearly equal in age, size and strength.")

As to sufficient evidence of force, the victim testified that she told the Defendant, "I don't want to have sex" when he approached her and inserted his penis into her.  [Tr. at 247.]  She also testified that she felt "scared" both when the Petitioner penetrated and ejaculated. [Tr. at 250.]  In addition, the state provided testimony that the victim could never completely care for herself and would require 24-hour assistance for her entire life. [Tr. at 503, 531.]  For example, the victim's half sister testified that the victim could only cook in a microwave. [*Id.*]  The victim's mother testified that she maintained control over the victim's finances. [Tr. at 530.]  Another witness described the victim as functioning at a pre-teen level. [Tr. at 530.]

As to the relationship between Petitioner Brady and the victim, Brady himself testified that he still had to wake the victim up every morning so she would get ready for work. [Tr. at 540.] Moreover, Brady testified that during the entire time the victim lived with him and his wife, they had maintained that they were in charge, they established the rules, and the victim had to live up to them. [Tr. at 562.]  For her part, the victim testified that Petitioner Brady is the only person she remembers as her father, [Tr. at 241], and that she was still subject to the Petitioner's rules because she lived at his house. [Tr. at 276.]

Based on this evidence, a rational trier of fact could have found the element of force necessary to convict him of rape as charged in count one.

Turning next to rape as charged in count seven and sexual battery as charged in count thirteen, Petitioner Brady says that insufficient evidence existed to prove that the victim's mental retardation substantially impaired her ability to resist or consent (rape) or substantially impaired her

-12-

Case No. 1:09-CV-09
Gwin, J.

ability to understand or control her conduct (sexual battery).

The Court finds sufficient evidence in the record to support the jury's verdict on these counts. Most significantly, because the victim testified at trial, the jury was able to assess for itself her level of functioning and her mental capacity. As noted above, the victim's relatives and several third-party witnesses also testified that the victim could not care for herself, could not drive, could not cook, and could not manage her own finances. In challenging the verdict, Petitioner Brady points to contrary testimony that the victim functioned as "a teenager," [Tr. at 582], and that she understood sexual conduct. [Tr. at 497.] Although this evidence does present perhaps some conflict as to the victim's ability to control her conduct and her ability to consent, the jury presumably weighed all of the evidence and nevertheless found Brady guilty. Because the Court finds support for the jury's verdict in the record, it denies Brady's petition on that ground.

### C. Grounds Five, Six, & Seven: Evidentiary Issues

With his next grounds for relief, Petitioner Brady argues that the trial court denied him due process when it refused to allow evidence of the victim's mental development, evidence of the victim's prior false statements, and evidence of Brady's good character.

A trial court's evidentiary rulings—which find their source in state law—are rarely grounds for habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus."). Nevertheless, "When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id.* Generally, however, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend some principle of justice so rooted in the traditions and conscience of our people as to be

-13-

Case No. 1:09-CV-09
Gwin, J.

ranked as fundamental.'" 329 F.3d at 512 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

*1. Mental Development*

As to evidence of the victim's mental development, in *State v. Zeh*, 509 N.E.2d 414 (Ohio 1987), the court held that in certain cases a criminal defendant may move to exclude clinical evidence of the victim's mental condition, unless the victim agrees to undergo an independent examination.  In this case, Petitioner Brady argues that the trial court improperly permitted several mental health professionals to testify about the victim without permitting him to undertake or introduce an independent evaluation.

This ruling does not constitute a denial of fundamental fairness.  Both the trial court and the state appeals court held that the prosecution's witnesses testified as fact witnesses, giving their observations about the victim's conduct and demeanor.  Although the Petitioner understandably argues that because these witnesses were mental-health professionals, the jury viewed them as *de facto* experts on the victim's mental condition, this argument simply asks too much.  Notably, the Petitioner cites to no portion of the record where the prosecution's witnesses were asked for their professional opinion or diagnosis of the victim or where they testified as to her cognitive development.  Simply, speculation about what inference the jury might have drawn from a fact witness's qualifications is not enough to support finding a violation of due process in this case.

*2. Impeachment Evidence*

Next, Petitioner Brady claims that the trial court erred when it refused to permit him to impeach the victim with specific evidence of her prior false statements.  At trial, the court permitted Petitioner Brady to ask the victim if she had lied about undergoing a "medical procedure," but would not allow any more specific questions. [Tr. at 284-85.]  Petitioner Brady argues that he should have

-14-

Case No. 1:09-CV-09
Gwin, J.

been allowed to say that the medical procedure was an ultrasound, that the victim had previously claimed she was pregnant, and that the victim had made prior false allegations of sexual misconduct.

As to the ultrasound and victim's claims that she was pregnant, the state appeals court found that Ohio's rape shield law prohibited the questions. *Brady*, 2007 WL 926365, at *13 (citing *State v. Miller*, 579 N.E.2d 276 (Ohio Ct. App. 1989)).  After the Petitioner's trial counsel asked the victim if she had told her co-workers that she was pregnant and that she had undergone an ultrasound, the prosecution objected. [Tr. at 284-85.] The court sustained the objections, instructing the jury to disregard the questions "with respect to any issue of sexual conduct or such by [the victim]." [*Id.* at 285.] Notably, the trial court permitted Brady to ask the victim whether she had lied about having a "medical procedure." [Tr. at 285] Moreover, other witnesses testified about the victim's truthfulness generally. [Tr. at 296-97, 437.]

In light of the fact that the trial court  permitted Petitioner Brady to introduce other evidence of untruthfulness and testimony about a medical procedure, the trial court's refusal to permit more specific evidence was not "so egregious" that it violates Petitioner Brady's due process rights.

Regarding the evidence of the victim's allegedly false prior allegations, the state court of appeals held that under *State v. Boggs*, 588 N.E.2d 813 (Ohio 1992), prior false allegations of sexual misconduct are collateral and may not be proved by extrinsic evidence. *Brady*, 2007 WL 926365, at *12-13.  In addition, the court found that the Petitioner had failed to meet his burden to show that the accusations were actually made, were false, and were unfounded. *Id.* at 12.  According to the Petitioner's proffer at trial, his evidence consisted of records from the county Board of Mental Retardation and Development Disabilities Group—records which the court reviewed *in camera* and found contained no allegations of any sexual misconduct—and testimony from third-party witnesses

-15-

Case No. 1:09-CV-09
Gwin, J.

that they believed the victim had previously made false allegations.

Given the speculative nature of this evidence, this Court cannot hold that its exclusion denied Petitioner Brady his right to due process.

*3. Evidence of Good Character*

Finally, Petitioner Brady argues that the trial court erred in preventing two witnesses from giving their opinions as to whether Brady would engage in "deviant behavior." The state appeals court held that Ohio Revised Code § 2907.02(D) prohibited the opinion evidence. *Brady*, 2007 WL 926365, at *13. Because § 2907.02(D) specifically precludes: "[O]pinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity . . .," the trial court followed Ohio's evidentiary law in excluding the evidence. Petitioner Brady cites to no case law to support his argument that this ruling nevertheless violates his due process rights.

Accordingly, the Court denies Petitioner Brady's request for relief on grounds five, six, and seven.

**D. Ground Eight: Confrontation Clause**

With his eighth ground for relief, Petitioner Brady argues that the trial court violated his Sixth Amendment right to confront the witnesses against him when it admitted the victim's out-of-court statements through third-party testimony. Although the victim testified at trial, she said she could not remember making particular statements about the rape and several other related incidents. The trial court permitted a county assistant psychologist and emergency room doctor to testify to some of these statements. Petitioner Brady thus contends that the victim's memory failure rendered her "unavailable and incapable of being confronted" for Confrontation Clause purposes, precluding admission of her testimony through third parties.

-16-

Case No. 1:09-CV-09
Gwin, J.

The Confrontation Clause bars the admission of "testimonial statements" made by persons who are not subject to cross-examination.  This bar applies regardless of whether a hearsay exception would otherwise allow admission of the statements. *See Crawford v. Washington, 541 U.S. 36, 68-69 (2004)*.

In this case, Petitioner Brady cites to no "clearly established" federal law holding that a witness who testifies at trial but cannot recall making certain statements is "not subject to cross-examination."  In fact, the law suggests the opposite. *See Crawford, 541 U.S. at 59 n. 9* ("[W]hen the declarant *appears for cross-examination at trial*, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.") (emphasis added); *accord State v. Gorman, 854 A.2d 1164, 1175-78 (Me. 2004) (holding that testifying witness is not constitutionally unavailable for confrontation purposes even though witness is impaired or forgetful), cert. denied, Gorman v. Maine, 544 U.S. 928 (2005)*.

To the extent Petitioner Brady contends that the third-party witnesses' testimony was inadmissible hearsay, this Court does not review a state court's evidentiary rulings except to determine whether the rulings deprived the Petitioner of a fundamentally fair trial.  *Bugh, 329 F.3d at 512*.  Given that the Petitioner did not object to the testimony and nevertheless had the opportunity to cross-examine both the witnesses and the victim herself, the Court finds that the testimony did not violate the Petitioner's due process rights.

### E. Grounds Nine and Ten: Jury Instructions & Overlapping Indictments

Petitioner Brady argues that the trial court failed to ensure that the jury convicted him unanimously and that the indictments were unconstitutional vague and overlapping.

Brady's first argument is not well taken.  The trial court instructed the jury that it was to

-17-

Case No. 1:09-CV-09
Gwin, J.

"consider the evidence with respected to each count separately and make your findings and note them on the verdict forms separately." [Tr. at 638]  Ultimately, the court twice cautioned the jury: "Whatever your verdict is, you must be unanimous . . .." [Tr. at 640, 670.]  These instructions adequately protected Brady's due process rights.

Moreover, to the extent Petitioner Brady argues that the allegedly vague indictments further denied him his right to conviction by a unanimous jury, that argument also fails.  *See Richardson v. United States, 526 U.S. 813, 817 (1999)* ("[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."); *see also State v. Gardner, 889 N.E.2d 995, 1004 (Ohio 2008)* ("Similarly, we do not require all jurors to agree whether a defendant raped a victim orally, vaginally, or anally, because all three constitute 'sexual conduct' in violation of the rape statute.  In such cases, there is no violation of the jury unanimity rule as long as all of the jurors agree that there was sufficient penetration to satisfy the 'sexual conduct' element of the crime of rape.").

Accordingly, the jurors in this case need not have agreed unanimously as to which specific sexual act constituted the elements of rape and sexual battery charged in each indictment.  Instead, the jury needed only to agree unanimously as to what *offense* Brady committed.  *See United States v. Savoires, 430 F.3d 376, 380 (6th Cir. 2005)* (holding prejudicial single indictment that charged two separate crimes because court could not ascertain whether jurors unanimously agreed as to what crime defendant committed).  Because each indictment against Petitioner Brady charged only a single count of rape or sexual battery, the jury's guilty verdicts on these counts do not run afoul of Brady's due process rights.

-18-

Case No. 1:09-CV-09
Gwin, J.

Petitioner Brady next contends that the state denied him due process because the indictment was too vague to ensure that the grand jury's indictment and the petit jury's verdict relied on the same facts. The state court of appeals found that Brady had waived this argument by failing to object to the indictment before trial. *Brady*, 2007 WL 926365, at *15-16. This Court accordingly finds the Petitioner has procedurally defaulted this claim.

A petitioner can procedurally default a potential habeas claim when he fails to observe a state procedural rule. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). For the default to bar consideration of the claim: (1) the Petitioner must fail to follow a firmly-established state procedure; (2) the state court must have actually denied consideration of the Petitioner's claim on the ground of the state procedural default; and (3) the state procedural rule must be an "adequate and independent state ground"—i.e., not take its substance from federal law. *Maupin*, 785 F.2d at 138. If these factors are satisfied, the Petitioner may only overcome the procedural default by demonstrating sufficient "cause" for his failure to follow the rule and actual prejudice from the underlying constitutional error. *Id.*

In this case, Petitioner Brady failed to adhere to Ohio's contemporaneous objection rule. *See Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006) (finding contemporaneous objection rule firmly established in Ohio). The state court of appeals invoked that rule as its basis for applying only plain error review to the Petitioner's claim. *Brady*, 2007 WL 926365, at *15-16. Moreover, that rule serves as an adequate and independent state ground. *Id.* (citing *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000) (recognizing Ohio's contemporaneous objection rule as adequate and independent state ground)).

In addition to failing to follow the state procedure, Brady has failed to show that the alleged

-19-

Case No. 1:09-CV-09
Gwin, J.

underlying constitutional violation—a vague indictment—actually prejudiced him.  Specifically,

Petitioner Brady claims that the vague indictments prevent him from determining whether the grand

jury indicted him for the same crimes for which the jury ultimately convicted him.  Although the jury

convicted Brady of four counts—two rape and two sexual battery—the trial court merged the similar

counts together for sentencing purposes and dismissed all remaining charges against the Petitioner.

Effectively, then, the jury only convicted Brady of one count of rape and one count of sexual battery.

In *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005), the Sixth Circuit held that the use of

twenty "carbon copy" indictments for child rape and twenty "carbon copy" indictments for felonious

sexual assault violated the defendant's due process rights.  The jury had convicted the defendant of

all twenty counts of rape and fifteen counts of sexual assault. *Id.* According to the court, the fact that

the indictments failed to differentiate among the counts prejudiced the defendant's ability to defend

himself against the charges and to claim double jeopardy. *Id.* at 636.  Nevertheless, the court

sustained the defendant's convictions on one count of each crime, noting:

> The prosecutor presented substantial evidence of ongoing abuse, against which
> Valentine had notice and opportunity to defend. The jury heard the witnesses,
> evaluated the evidence, and was convinced of Valentine's guilt. *Had this case been
> tried in two counts, the convictions would clearly stand.* Thus, any constitutional
> error with regard to the other 38 counts should not render invalid these two counts.

395 F.3d at 637 (emphasis added).

Similarly in this case, although the jury convicted Brady of two counts of each crime, the trial

court found that the state had indicted in the alternative and merged those counts for sentencing. [Tr.

at 705.]  Because sufficient evidence supported the two convictions, Brady cannot show adequate

prejudice resulting from the potentially vague language of the indictment.

Finally, Petitioner Brady claims that the nature of the indictment precluded him from fully

Case No. 1:09-CV-09
Gwin, J.

exercising his appellate rights—i.e., he cannot challenge the specific facts underlying his convictions because they were never specified. The state court of appeals addressed this argument and concluded that because Brady was only "convicted" of a single count of rape and a single count of sexual battery and because sufficient discrete evidence existed to support each conviction, Brady had a full and fair opportunity to challenge those convictions on appeal.

Brady cites only *Evitts v. Lucey*, 469 U.S. 387 (1985) in support of his argument that this course of events effectively denied him his due process right to an initial appeal of his conviction. In *Evitts*, however, the Court only held that criminal defendants have a due process right to effective assistance of counsel on appeal. *Id.* at 396. Moreover, Petitioner Brady did challenge the factual bases of his convictions and the state court of appeals found them sufficient. *Brady*, 2007 WL 926365, at *16-18. Therefore, Petitioner Brady cannot argue now that the indictment somehow prevented him from challenging those convictions on appeal, in violation of due process.

Accordingly, the indictments in this case did not violate Petitioner Brady's constitutional rights.

### F. Ground Eleven: Constitutionality of Ohio's Sexual Battery Statute

In his next ground for relief, Petitioner Brady claims that Ohio's sexual battery statute is unconstitutional as applied to him. According to Brady, the law runs afoul of the United States Supreme Court's decisions in *Griswold v. Connecticut*, 381 U.S. 479 (1965) (holding state ban on contraceptives violated right of marital privacy), and *Lawrence v. Texas*, 539 U.S. 558 (2003) (finding law criminalizing "deviant sexual intercourse" unconstitutional), because the Ohio law criminalizes sexual relations between a step-parent and adult step-daughter not biologically related to one another. The state appellate court rejected this claim, noting that a prior appeals court had

Case No. 1:09-CV-09
Gwin, J.

upheld the law when faced with a similar constitutional challenge. *Brady*, 2007 WL 926365, at *18-19 (citing *State v. Benson*, 612 N.E.2d 337 (Ohio Ct. App. 1990).

Contrary to Brady's assertion, however, neither *Griswold* nor *Lawrence* constitute "clearly established" federal law that a state may not criminalize sexual conduct between a parent and a mentally-impaired step-child.  In fact, the Court in *Lawrence* noted: "The present case does not involve minors.  It does not involve persons who might be injured or coerced or who are situated in relationship where consent might not be easily refused." 539 U.S. at 578.  Because the state court did not run afoul of clearly established federal law, the Court denies Brady's eleventh ground for relief.

### G. Ground Two: Ineffective Assistance of Counsel

Finally, Petitioner Brady claims that his trial counsel failed to provide him effective assistance of counsel, in violation of the Sixth Amendment.  The state court of appeals rejected this claim because it had already found the Petitioner's underlying challenges without merit: "As we have rejected each of those errors, no error has been shown and the claim of ineffective assistance of counsel must fail." *Brady*, 2007 WL 926365, at *19.  As the Sixth Circuit has held, however, this type of reasoning may not be a sufficient adjudication of the ineffective assistance claim on the merits for habeas purposes. *See Benge v. Johnson*, 474 F.3d 236, 246 (6th Cir. 2007).  Out of an abundance of caution, therefore, this Court reviews Petitioner Brady's ineffective assistance claim de novo. *Benge*, 474 F.3d at 247.

To prove constitutionally ineffective assistance of counsel, Petitioner Brady must show that (1) his counsel's performance was deficient, and (2) this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A petitioner's counsel performs

Case No. 1:09-CV-09
Gwin, J.

deficiently when his performance falls short of the norms of the legal profession. *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).  A petitioner establishes prejudice by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." 977 F.2d at 229.

In this case, Petitioner Brady complains of his attorney's failure to (1) object to the improper jury instruction on force, (2) object to the vague indictments, (3) request a specific unanimity jury instruction, (4) request a pre-trial *in camera* hearing on certain impeachment evidence, and (5) object to hearsay testimony by the victim's psychology assistant Lisa Gessler and emergency room physician Dr. Debra Russell.

Even assuming counsel's actions were deficient, however, Petitioner Brady's complaints fail because he has not shown that but for these alleged deficiencies, he would have been acquitted of rape or sexual battery.  As for the force instruction, the instruction properly states Ohio law on the reduced showing of force required when the alleged rape involves a parent and impressionable child; thus, an objection would have been futile.  As to the allegedly vague indictments, the Petitioner was able to challenge the sufficiency of the factual evidence on appeal and all the counts in the indictment were either merged or dismissed.  Accordingly, a more specific indictment would not have altered the outcome of the trial.

Similarly, the trial court gave the jury a proper unanimity instruction, so Brady cannot show that an additional unanimity instruction would have resulted in an acquittal.  As to the impeachment evidence, the Petitioner makes no showing as to what evidence the trial court excluded based on his counsel's proffer that would have been included had counsel only requested a pre-trial hearing.

Although the admission of the testimony of psychology assistant Lisa Gessler's and ER

Case No. 1:09-CV-09
Gwin, J.

doctor Debra Russell is more troubling, this same analysis applies.  Gessler testified that when she

met the victim, the victim told her that her father:

> touches me down below.  I had to ask her what do you mean? Your
> privates? She said yes, and then she was talking about he wants to do
> it and I tell him no, and there was something out of the shower but I
> was never really clear who was getting out of the shower but she was
> talking about something around the shower, something occurring
> around the showers, and I think she had some worries about
> pregnancy because she said he puts it in me.  He doesn't put anything
> on it, and I asked her if she meant a condom and she said yes and then
> she said something about he does it hard and I keep getting infections.

[Tr. at 336-37.]  Gessler also testified that the victim told her the Petitioner started this conduct

around the time of his arm surgery. [Tr. at 343.]

Treating physician Dr. Russell testified that she first met the victim when the victim came

into the emergency room at Southwest General Hospital. [Tr. at 376.]  Dr. Russell said that the

victim told her that her father had recently "put his part inside of her," that the victim "asked him

to stop and pushed his face away but he did not stop." [Tr. at 380-81.]  Dr. Russell also testified that

the victim described a number of other encounters where her father had made her "kiss him down

there on his part." [Tr. at 381-82.]  Dr. Russell also testified as to the victim's statements about what

clothes the victim had worn during the most recent incident and why the victim had not told anyone

else about the conduct. [Tr. at 384-85.]

Both psychology assistant Gessler's and Dr. Russell's testimony, however, is cumulative of

the victim's testimony.  For example, the victim herself testified that her father penetrated her and

ejaculated and that on at least one other occasion he had made her kiss his penis. [Tr. 250-53.]

Although the jury could have relied on Gessler's and Dr. Russell's testimony and convicted

Petitioner Brady of multiple counts of rape and sexual battery, the trial court ultimately merged his

-24-

Case No. 1:09-CV-09
Gwin, J.

four convictions into two, one for rape and one for sexual battery.  The victim's testimony alone would have been sufficient to sustain these two convictions.  Thus, Petitioner Brady cannot show that had the additional testimony only been excluded, the jury could not have found him guilty of rape or sexual battery.

Accordingly, the Court finds that Petitioner Brady has not shown that his trial counsel provided ineffective assistance of counsel.

### III.  Conclusion

For the foregoing reasons, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation and **DENIES** Brady's petition for a writ of habeas corpus.

Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith and that no basis exists upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed R. App. P. 22(b).

IT IS SO ORDERED.


Dated: April 29, 2010                                    s/        *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE